IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
8/30/2021
JEFFREY P. COLWELL, CLERK

Civil Action No. 21-CV-01684-GPG

DELMART E.J.M. VREELAND, II,

     Plaintiff,

v.

JARED POLIS,

PHILIP WEISER,

COLE WOODWARD,

WILLIAM ALLEN,

DEAN WILLIAMS,

TRAVIS TRANI,

SCOTT DAUFFENBACH,

LARRY TURNER,

ANDRIENNA JACOBSON-SANCHEZ,

CDOC DIRECTOR OF PRISONS - JAMES OLSON,

WILLIAM LITTLE,

DAIVD LISAC,

JEREMY BRANDT,

BRANDY HUNSAKER,

KATHLEEN BOYD, and

WILLIAM ROGERS, III,

     Defendants.

## AMENDED COMPLAINT

1

## A.    PLAINTIFF INFORMATION

**Delmart E.J.M. Vreeland, II – WDOC Number 33583**

**2900 South Higley Road – P.O. Box 400**

**Rawlins, Wyoming 82301-0400**

## B.    DEFENDANT(S) INFORMATION

**Defendant 1:**

Jared Polis, Governor, State of Colorado, 230 E. Colfax Ave. / State Capitol Building Denver, Colorado 80203

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? **YES**. Defendant was acting as elected official or employee of state agency.

Defendant is sued in his/her individual capacity.

**Defendant 2:**

Philip Weiser, Colorado Attorney General, 1300 Broadway, Denver, Colorado 80203

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? **YES**. Defendant was acting as elected official or employee of state agency.

Defendant is sued in his/her individual capacity.

**Defendant 3:**

Cole Woodward, Assistant Colorado Attorney General, 1300 Broadway, Denver, Colorado 80203

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? **YES**. Defendant was acting as employee of state agency.

Defendant is sued in his/her individual capacity.

2

**Defendant 4:**

William Allen, Assistant Colorado Attorney General, 1300 Broadway,

Denver, Colorado 80203

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? **YES**. Defendant was acting as employee of state agency.

Defendant is sued in his/her individual capacity.

**Defendant 5:**

Dean Williams, Director, Colorado Department of Corrections

1250 Academy Park Loop, Colorado Springs, Colorado 80910

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? **YES**. Defendant was acting as employee of state agency.

Defendant is sued in his/her individual capacity.

**Defendant 6:**

Travis Trani, Associate Director, Colorado Department of Corrections

1250 Academy Park Loop, Colorado Springs, Colorado 80910

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? **YES**. Defendant was acting as employee of state agency.

Defendant is sued in his/her individual capacity.

**Defendant 7:**

Scott Dauffenbach, Assistant Director of CDOC Offender Services

1250 Academy Park Loop, Colorado Springs, Colorado 80910

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? **YES**. Defendant was acting as employee of state agency.

Defendant is sued in his/her individual capacity.

3

**Defendant 8:**

Larry Turner, CDOC Inspector General Office Intelligence Supervisor

1250 Academy Park Loop, Colorado Springs, Colorado 80910

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? **YES**. Defendant was acting as employee of state agency.

Defendant is sued in his/her individual capacity.

**Defendant 9:**

Adrienne Jacobson-Sanchez, Assistant Director CDOC Legal Services

1250 Academy Park Loop, Colorado Springs, Colorado 80910

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? **YES**. Defendant was acting as employee of state agency.

Defendant is sued in his/her individual capacity.

**Defendant 10:**

James Olson, CDOC Director of Prisons

1250 Academy Park Loop, Colorado Springs, Colorado 80910

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? **YES**. Defendant was acting as employee of state agency.

Defendant is sued in his/her individual capacity.

**Defendant 11:**

William Little, CDOC, CSP Warden

P.O. BOX 777, Canon City, Colorado 81215

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? **YES**: Defendant was acting as employee of state agency.

Defendant is sued in his/her individual capacity.

**Defendant 12:**

David Lisac, Assistant Warden, CDOC, CSP

P.O. Box 777, Canon City, Co 81034

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? **YES**. Defendant was acting as employee of state agency.

Defendant is sued in his/her individual capacity.

**Defendant 13:**

Jeremy Brandt, CDOC, CSP Major

P.O. Box 777, Canon City, Co 81034

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? **YES**. Defendant was acting as employee of state agency.

Defendant is sued in his/her individual capacity.

**Defendant 14:**

Brandy Hunsaker, CDOC, CSP Captain

P.O. Box 777, Canon City, Co 81034

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? **YES**. Defendant was acting as attorney under retainer of state agency.

Defendant is sued in his/her individual capacity.

**Defendant 15:**

Kathleen Boyd, PA, CDOC/CSP

P.O. BOX 777, Canon City, Colorado 81215

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? **YES**. Defendant was acting as attorney under retainer of state agency.

Defendant is sued in his/her individual capacity.

5

**Defendant 16:**

William Rogers, III, Attorney at Law

2060 Broadway, Suite 400, Boulder, Colorado 80302

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? **YES**. Defendant was acting as attorney under retainer of state agency.

Defendant is sued in his/her individual capacity.

## C.   JURISDICTION

**XX**   **42 U.S.C. § 1983:** (state, county, and municipal defendants)

**XX**   **Other: 28 U.S.C. § 1367**, Supplemental Jurisdiction of state law claims under Colorado Revised Statutes and Colorado Constitutional provisions asserted within the body of the claims below.

D. STATEMENT OF FACTS RELEVANT TO ALL CLAIMS

This is a three-section statement of facts; (A) Events which took place at CDOC/CSP and the actual transfer from Colorado to Wyoming; (B) Events which took place upon arrival to Wyoming Department of Correction's ("WDOC") Wyoming Medium Correctional Institution, ("WMCI"); and (C) Events that took place at WDOC's Wyoming State Penitentiary ("WSP").

(A) Between October 2008 and May 20, 2021, Plaintiff was a state prisoner in Colorado whom has/had a variety of civil right violation complaints pending before both state and federal courts. Plaintiff is right handed, and right hand handicapped, thus writing anything by hand is painful as Plaintiff cannot hold a pen/pencil, and everything looks bad due to that handicap. As such, without typewriter or computer access, Plaintiff requires assistance from department of corrections in accessing court and with preparing all pleadings in the absence of typewriter and/or computer.

Over the years of incarceration in Colorado, Plaintiff was subjected to a variety of forms of retaliation for filing grievances and law suits. Plaintiff continually sought protection from the United State District Court, Denver, Colorado judges and magistrates, and at all times was completely denied any protection and the illegal retaliations simply continued and got worse over time as the state actors were embolden as a result of the courts' refusals to offer any form of protection and/or to even attempt to try and prevent the different forms of retaliation from continuing.

In 2020 Plaintiff was subject to retaliation and placed in a 72-days, 7-different-prison transfer status. The facts behind the retaliation in that instance are before the court in Vreeland v. Polis, et al., 20-CV-02420-PAB-SKC, ("Polis 1"), also before this very Court. Additionally, conduct preventing already in progress lower level facility transfers and classification corrections; and

threats to cause out of state transfers, were addressed in other cases such as Vreeland v. Huss, et al., 18-CV-00303-PAB-SKC, and Vreeland v. Vigil, et al., 18-CV-03165-PAB-SKC.

During the year 2020, Plaintiff was constantly threatened by various herein named defendants, the threats consisted of, inter alia, transfers from one prison to another, and/or transfer out of the State of Colorado. The threats were retaliation and were due to Plaintiff engaging in protected conduct of filing grievances and law suits.

Plaintiff served several Fed.R.Civ.P. Rule 65 motions seeking protection and injunctions to stop the threats and retaliation, as stated, the two judges refused to protect Plaintiff from the state actors' retaliation and allowed the retaliation and harassment to continue.

On March 4, 2021, Plaintiff filed a petition for a writ of habeas corpus seeking his release from illegal incarceration. The petition was filed pursuant to Colorado Revised Statutes ("C.R.S.") § 13-45-101, the petition also combined and sought relief under Crim. P. 35(a) and (c).

Defendants Polis, Weiser, Woodward, Allen, Williams, Trani, Dauffenbach, Jacobson, Turner, CDOC Central Classification Supervisor, CDOC Director of Prisons, Little, Lisac, Brandt, Hunsaker, Dietze & Davis, PC., and Rogers, were all informed of the filing of the habeas corpus petition, and the fact that any transfer would be illegal and a class six felony. These state actors have admitted in federal court pleadings that they were in fact notified of the fact that the habeas petition was filed and pending, and that any transfer of Plaintiff would be a felony.

The State court did not deny the habeas corpus petition and instead set a briefing schedule and ordered the state to produce case files and evidences that had been suppressed between 2004 and 2020, had never been produced and which were

all exculpatory. The court ordered the state to produce the case files and evidences, and then on 4/30/2021, granted Plaintiff and his lawyer 45-days to meet and review that evidence and to then present that new evidence in an amended petition which addressed the new evidence that had been suppressed for over fourteen years.

In April 2021 Plaintiff was still receiving threats from several herein named defendants that they were going to transfer Plaintiff again, move him out of state, seize and destroy all legal case flies if Plaintiff would not drop the Polis 1 case. These threats would also be accompanied with weeks-long pre-transfer lockdowns, and were notated, "allegedly" in Plaintiff's inmate files.

As a result of the constant threats and lockdowns which impacted access to counsel and courts, Plaintiff's lawyer William T. Griffin of "The Griffin Law Firm", contacted Defendants Weiser, Woodward, Williams, Trani, and Dauffenbach. Plaintiff's family and friends contacted Defendant Polis, Weiser, Woodward, Williams and Trani. Defendants were all contacted by email, telephone and registered letters.

Defendant Dauffenbach discussed the threats being made to Plaintiff with Plaintiff's attorney Mr. Griffin. Dauffenbach stated to counsel that he understood the threats to be real, but that they were just "baseless rumors", and assured that Plaintiff would remain at CDOC's CSP and would be available for all court dates and meeting with attorney Griffin for all pending court cases.

Defendants Woodward and Lisac advised the Court that Vreeland would remain at CSP and would receive all required medical testing and care, would then receive a job. This was asserted in Vigil, supra at ECF 102.

Even though the defendants were telling the Court, Plaintiff and his counsel no transfer was going to take place, Othe threats were not going to be acted upon, Plaintiff simply did not believe or trust them and so Plaintiff attempted to stop

any transfer by offering to sacrifice all his civil right cases by offering to dismiss them all just to end the threats.

As a result of the constant threats of transfers which would no doubt impact the habeas corpus action and access to counsel and review of the new evidence with counsel, and which would delay any resentencing and/or release, Plaintiff advised all lawyers for all cases, i.e. 17-CV-01580-PAB-SKC; 18-CV-00303-PAB-SKC; 18-CV-03165-PAB-SKC; 20-CV-02330-PAB-SKC; and 20-CV-02420-PAB-SKC, that Plaintiff would dismiss all cases willingly in exchange for only being left alone, granted the medical care CDOC agreed Plaintiff required, and to be left at CSP until after the resentencing took place as a result of the habeas corpus action.

State actors refused to provide the medical care at all; and Defendants Dietze & Davis, PC, and Rogers never passed the offer onto CDOC and refused to even respond to the offer to dismiss the case. Plaintiff's lawyer, Mr. Griffin, also attempted to contact Defendant's Woodward and Rogers to discuss dismissal of the cases, Defendant Rogers refused to communicate with Mr. Griffin and/or to pass the information onto his clients.

Plaintiff has confirmed that Defendants Dietze & Davis, PC, and Rogers have never passed the offer to dismiss onto his client Polis, Weiser, Williams, or Olson and Reid, choosing instead to keep the cases going in effort to obtain more fees from the State of Colorado and CDOC.

On May 18, 2021, a preliminary scheduling conference was held by U.S. Magistrate Judge S. Kato Crews in Vreeland v. Huss, 18-CV-00303-PAB-SKC. Discovery limitations and deadlines were discussed and set, Plaintiff advised that he was going to offer to dismiss the case, the Court notated the offer in the hearing minutes.

After the preliminary scheduling conference concluded, a private recorded telephone conference took place between Plaintiff and Defendants Allen and Vilner.

Plaintiff advised that he was willing to dismiss the case as long as the Colorado Attorney General's Office did not object or impede an oral deposition of former Douglas County Sheriff Sergeant R.M. French, now a convicted felon for sex offense against children, whom planted evidence on Plaintiff in Plaintiff's criminal case and withheld exculpatory evidences and tampered with witnesses. Plaintiff detailed the relevant of the testimony in the Huss case as it pertained to French, and that the testimony was needed in another matter. Plaintiff advised that Plaintiff would have his counsel contact the two lawyers to discuss and schedule the deposition and Plaintiff's attorney, Mr. Griffin, would conduct that deposition but Plaintiff would be present in some fashion. The two lawyers agreed not to object or impeded the deposition of French.

After the May 18, 2021 preliminary scheduling conference ended, Plaintiff contacted Mr. Griffin and advised him of the agreement, Mr. Griffin agreed to meet with Plaintiff at CSP in the week to come and to contact Defendant Allen and Vilner after the meeting with Plaintiff at CSP in effort to complete the deposition in the 21-days period it was needed in.

After the private telephone conference ended, and after discussing the issues with Mr. Griffin, a CDOC staff member, "male", called a Case manager 3, approached Plaintiff and advised that total dismissal of "claims" was required for Plaintiff to remain at CDOC/CSP incentive unit. Plaintiff asked the C.M. 3 to have the position emailed to his lawyer, advised he would not dismiss anything he did not have to, and informed he would advised Judge Brimmer of the position presented.

Because the threat to be transferred immediately was real, Plaintiff's attorney, Mr. Griffin, filed a state court complaint seeking preliminary injunction to prevent the threatened transfer. Mr. Griffin also advised by telephone and email, Defendants Weiser, Woodward, Williams, Trani, Dauffenbach, Jacobson and the Director of Prisons, that the state court writ was pending and

that any transfer would violate C.R.S. § 13-45-114, would be a class six felony, would impede access to court and counsel, would prevent counsel and Plaintiff's investigators from meeting with Plaintiff to review the newly produced evidence provided by the state court which was suppressed for over 14 years, would prevent Plaintiff review of case files and evidences and discovery, and would cause serious injury. Counsel then attempted to schedule dates at CDOC/CSP for attorney client meeting and for attorney investigator / Plaintiff meeting to begin the case file and evidence review process as the 45-days provided by the state court was ticking.

Plaintiff and counsel were told, if Plaintiff refused to cease his litigation in Polis, Huss and other matters, Plaintiff would be immediately moved. Counsel told Defendants Polis, Weiser, Woodward, Williams, Dauffenbach, Trani, Jacobson, Little and Lisac that counsel would serve the injunction to them that week, i.e., by May 21/2021, as he had a 10-day jury trial starting 5/20/2021.

Less than 48 hours after the preliminary scheduling conference in Huss, supra, on May 20, 2021, at approximately 2:20 a.m., four CDOC/CSP staff arrived to Plaintiff's room and ordered Plaintiff, on video, to get dressed and to "Come with us". Plaintiff was taken to the prison intake department and left there until approximately 4:00 a.m.. At approximately 4:10 a.m., Defendant Hunsaker set up several GO-Pro audio/video recording devices and pointed all cameras at Plaintiff in a holding room where he was locked in.

On video Defendants Brandt and Hunsaker rolled all Plaintiff's property in front of the room Plaintiff was held in and then ordered Plaintiff to pack all property as he was being transferred.

While Plaintiff was packing his property on audio/video, Plaintiff spoke to Defendants Brandt and Hunsaker and informed of the fact that any transfer was illegal as a writ of habeas corpus was pending. Plaintiff advised that the

12

transfer was illegal. Defendants Brandt and Hunsaker 0admitted to knowing of the pending writ, acknowledged what Plaintiff was saying, but disregarded it with an "I am immune" attitude.

On video Plaintiff addressed the fact that CSP staff had broken his typewriter and television during their hasty job of packing all Plaintiff property in a laundry cart and all on top of each other in no proper fashion. Defendant Brandt stated that CDOC would pay for any broken property.

On video Plaintiff asked to have his UTAB-7 tablet computer given to him to pack, Defendant Brandt stated the tablet was locked in property and would be sent to Plaintiff at his new facility.

Plaintiff asked Defendant Brandt why the packup was being done on video, Brandt replied that this was being done so when property was seized or lost by Wyoming actors Plaintiff could not sue CDOC or any CSP staff for that loss.

CDOC/CSP actors then videotaped the placing of all Plaintiff's property into a van for transport, the video also captured the placing of Plaintiff into the same van for transport. The video reveals Plaintiff was placed in a "dog catchers van", i.e., no leg or head room and no place to sit. The cage area was all steel, the set was a sheet of steel made into a bench seat which was about 8 inches wide and 6 feet long. Once seated Plaintiff's head was bent as there was no head room area, and no leg room as the leg room was closed off by more steal sheets.

While being forced into the van Plaintiff advised Defendants Brandt and Hunsaker that Plaintiff had medical issues which required that he not be transported in such a van. Plaintiff asked to see medical and mental health, Defendant Brandt and Hunsaker refused this request. Prior to transport no medical or mental health screen or interview was conducted. Plaintiff was placed in the van in belly chains and leg chains and given two garbage bags and told to urinate or defecate in the bags. Plaintiff stated this was not possible with a jump suit

and chains on, Plaintiff was then told "you can either hold it or shit yourself because we aint stopping".

Plaintiff was then put through an approximate five hour van ride from Canon City, Colorado, to Torrington, Wyoming. Plaintiff was denied proper seating, seatbelt, and toilet access. Plaintiff was tossed all over the back of the van like a paper doll. When the van accelerated he was tossed to the back of the van, and when the van braked Plaintiff was tossed to the front of the van smashing his body and face into the metal screens at each instance.

The van transport process cause Plaintiff actual physical injuries. Plaintiff suffered cuts and bruising to the back left side of his head, face, and shoulder impact impact-injuries as result of trying to stop the constant 5 hours of acceleration and breaking impacts every time it occurred. The injuries were visible to the naked eye.

During the approximate 5 hour trip Plaintiff attempted to get transport and driver's attention to stop the constant acceleration and breaking, and to ask to have air turned on and radio turned off. The temperature was over 95 degrees in the van and transport officers refused to turn air on; the radio was turned on full blast in the back of van and was defining. The transport staff refused to turn air on or radio down, and refused to stop the acceleration and breaking and laughed about it and told Plaintiff to "enjoy the carnival ride"

The transfer of Plaintiff on 5/20/2021, Plaintiff's birthday, was specifically set for Plaintiff's birthday in effort to cause as much as possible and additional psychological and emotional torture and impact as the defendants could met out, just as was the illegal alteration of Plaintiff's parole eligibility date from 2024 to 2144 at Christmas of 2019 which is being addressed in Polis (1). These dates were intentionally chosen by Defendant Dauffenbach, Turner and Jacobson in effort to cause emotional impact and yearly reminders for

14

years to come of the retaliation and both mental and physical torture Plaintiff has suffered from at the hands of these state actors. For the rest of Plaintiff's life he will in fact suffer from PSTD, he will relive and recall the events of these days as well as the retaliation, conduct, and torture he has been subjected to by these state actors.

At approximately 10:40 a.m. on May 20, 2021, Plaintiff's birthday, defendants named herein illegally, in violation of state and federal law and right, dropped Plaintiff off at the WDOC's WMCI at Torrington, Wyoming.

(B)  The following took place between 5/20/2021 and 6/17/2021 while Plaintiff was at WDOC/WMCI.

On May 20, 2021 Plaintiff arrived at WMCI as a CDOC prisoner, a true 2 point minimum custody prisoner whom had never in over 16-years had even one misconduct report, and whom had lived most of his confinement in single room incentive units which Plaintiff was required to earn, all State of Colorado prisoners have a right to earn that status and single room.

Plaintiff arrived with approximately four cubit feet of legal case files and other property he owned at CDOC except his UTAB-7 tablet computer.

Plaintiff also arrived with twelve different medications, enough to last of each medication for at least 75-days, all medications had expiration dates of 2022. Plaintiff also arrived with American with Disability Act accommodations and restrictions and devices, i.e., lifting restrictions, back brace, lower bunk/tier restrictions, and still requiring surgeries for several medical issues addressed in other cases such as spinal damage, epididymal tumor/cysts, and incisional hernia.

Upon arrival to WMCI all of Plaintiff's property, medications, and medical devices were seized. Plaintiff was placed in Unit A run by WDOC CO. J. McCoy. Plaintiff was assigned to a room with an inmate whom had just been arrested for

parole violation and whom had not been vaccinated for COVID-19.

Plaintiff requested access to a telephone to call his lawyer and family to advise of the transfer; Plaintiff requested medical care, medications, and that his A.D.A. accommodations and medical restrictions and devices be complied with and provided; Plaintiff requested access to his property, legal files and typewriter. Plaintiff was denied medical care by WDOC/WMCI medical staff and Corizon Health Care, Inc., medical staff, and then denied all other requests by WMCI staff Pacheco, Burkhalter, Case, and Ross.

All Plaintiff's property, law books, case files, address book with telephone numbers and addresses of every person Plaintiff knew, and his lawyers address and telephone number, were all seized. Original documents and exhibits for state and federal court cases were seized and destroyed. Plaintiff's white legal box containing all current case files was thrown in the garbage. Of the 4 cubit feet of legal materials Plaintiff arrived to WDOC WMCI with, about 225 pounds in all, only 49 pounds was saved, less than 1/4th the total legal materials, the rest was either placed in garbage or lost by WDOC/WMCI employees.

Plaintiff attempted to serve grievances at WDOC/WMCI in regards to denial of medical, access to counsel and legal materials. After filing the grievances a Mr. Ross, WDOC/WMCI grievance manager met with Plaintiff to discuss the grievances. During the conversation Mr. Ross let it be known that he believed this Plaintiff had acted as informant for Colorado and CDOC law enforcement for several years, and that WDOC wanted Plaintiff to act as informant for WDOC and advise WDOC investigators anything Plaintiff was aware of in regards to any possible retaliation plots being concocted by Colorado/Wyoming 211-Crew gang members.

Mr. Ross advised that there was word going around that a murder plot was being planned to murder several WDOC employees whom were allegedly associated with the circumstances surrounding the death of former Colorado prisoner, Benny Davis,

the founder of 211-Crew whom ended up dead at WDOC's WSP.

Plaintiff responded to Mr. Ross and told him that, although there was in fact some talk about such a thing by 211 and MS-13 gang members in Colorado, Plaintiff was not getting involved in it, and attempted to focus on the grievances at issue which the meeting was set up for. Plaintiff advised he was being denied medical care, access to counsel and his property, and had quickly approaching court filing deadlines and needed his legal materials and typewriter.

Mr. Ross advised that he was going to tell Warden Pacheco what was stated, but that if Plaintiff refused to act as informant the requests would be denied and Plaintiff would be sent to WSP to live with the gang members and the gang members would most likely be told "by someone" that Plaintiff was an active informant. With that Plaintiff left the room.

About 2-days after the meeting with Mr. Ross, two men appeared at WDOC's WMCI asserting they were law enforcement officials and wanted to talk to Plaintiff about the alleged 211 MS13 gang plot to murder WDOC staff. Plaintiff was sent to a room where the two men were. Plaintiff advised that he was not talking to them, wanted to talk to his attorney, and was concerned for his own safety as these people were labeling Plaintiff and out of control.

Plaintiff got up and tried to leave the room and end the attempted interrogation. One man, a real fat guy, jumped out of his chair and assaulted Plaintiff to force Plaintiff to sit back down, and then began making threats to have Plaintiff harmed by inmates and threatened to call Plaintiff's sentencing judge and sabotage any resentencing that was supposed to take place as a result of the habeas corpus /35(a)(c) petition. Plaintiff still refused to talk to them and act as their informant. Once the two men realized threats and assaults would not help them, they left. Plaintiff asked to see medical and get a photo of the assault and WDOC/WMCI Warden Pacheco and Mr. Ross denied the request.

A day after the two men left a Mr. Burkhalter attempted to interrogate Plaintiff a third time by advising Plaintiff that WDOC needed names of all 211 and MS13 members Plaintiff knew of so they could keep Plaintiff safe, and if Plaintiff refused to tell the names Plaintiff would be sent to WSP to live with the gang members and the gang members would know whom Plaintiff was and would be able to harm Plaintiff. Plaintiff still refused to talk and advised he would let his family know what the man had said. Plaintiff advised that he did have enemies at WSP, but did not know their names as Plaintiff did not know whom old 211 gang members had spoken to.

While all of this was going on, both before and after refusing to act as informant for WDOC, a transgender security guard named Jason McCoy started doing GOOGLE searches of Plaintiff and stated she/he knew whom Plaintiff was, and attempted to interrogate Plaintiff about gang information and what was found on GOOGLE.

Plaintiff refused to answer his questions and told her/him to stop and leave him alone. To being told to stop, McCoy then advised inmates in A-Unit that Plaintiff was a former federal agent, snitch, and sex offender, and told inmates in the unit to look Plaintiff up on Wikipedia, a search engine that WDOC allows inmates to access in the housing unit computer, to see Plaintiff's charges.

McCoy intentionally, with intent to cause harm to Plaintiff, labeled Plaintiff as a former federal agent, a snitch and sex offender. McCoy verbally labeled Plaintiff as a former federal agent, snitch, and sex offender, and attempted to interrogate Plaintiff face to face, through the cell door, and over the intercom system at WDOC/WMCI's A-Unit.

The labeling of Plaintiff and interrogations got so bad that Plaintiff's cell-mate yelled at McCoy and told her/him to stop the interrogation. McCoy refused to stop the interrogation and calling of Plaintiff a sbitch, so Plaintiff

advised McCoy that Plaintiff was filing an emergency grievance with the Warden to put a stop to what McCoy was doing.

Plaintiff filed the grievance and it went to Mr. Ross. In response to the grievance (i) As retaliation McCoy issued three false misconduct reports against Plaintiff asserting Plaintiff used profane language when he stated he needed his medication or he would just puke up and shit out the food all over himself. McCoy asserted the words puke and shit were profane. When the hearing officer concluded this was not a violation, a different staff member, McCoy's friend Ms. Dykes, stated Plaintiff had used the word "Fuck" in the sentence so he should be punished for that. Plaintiff advised he never said the word fuck, and if he would have really said fuck, McCoy would have stated so in his bogus report; (ii) Mr. Ross stated he required time to investigate the allegations made against McCoy by Plaintiff, i.e., the allegation that McCoy was using A-Unit computers to GOOGLE search Plaintiff and chat on internet chatrooms to get information on Plaintiff, and the false report.

While at WDOC's WMCI between 5/20/21 and 6/17/21 Plaintiff sent various letters to the WDOC WMCI medical department seeking access to the twelve medications Plaintiff was sent to WMCI with from CDOC; seeking medical care and testing and asking if WDOC/WMCI was going to provide the surgery for Plaintiff that CDOC advised WDOC Plaintiff required and that CDOC had told U.S. District Court Judges Brimmer and Crews, were scheduled but just delayed for a short time due to COVID-19.

The WDOC/WMCI medical staff denied access to the medication; denied A.D.A. accommodations; and asserted CDOC Defendants Dauffenbach, Turner, Boyd and Petrossi did not advise WDOC that these medications, accommodations, and surgeries were needed so they were all being denied and/or cancelled. Plaintiff advised WDOC/WMCI medical staff this was not true and offered medical files to them, which

they refused to accept.

Plaintiff was also told by three different WDOC medical staff, employees of Corizon Health Care, Inc., that Corizon was not paying for all these medications and surgeries.

On 6/16/2021 Mr. Ross and Burkhalter appeared in the C-Unit waiting room with a box they assured was the grand-total of all of Plaintiff's legal files which WDOC received from CDOC on 5/20/2021. The two men wanted Plaintiff to take possession of the materials and sign a paper asserting Plaintiff had in fact been delivered all of the same legal materials he had packed up himself at CSP in Colorado prior to transfer to WDOC. Plaintiff refused to take possession of the materials or to sign the document as it was obvious that more than three quarters of the grand total of materials were in fact missing. The very next morning Plaintiff was transferred to WSP.

Between 5/20/21 and 6/17/21 Plaintiff was held at WDOC's WMCI on 23 hour lockdown, and denied any form of out of room exercise or activity except showers. When using showers at WMCI Plaintiff noticed/observed that there was no shower curtains and that female staff, male staff, and all inmates were given clear view of Plaintiff and any other person using the showers. Plaintiff attempted to address this PREA violation and was punished with denial of soap to shower with for 9-days.

On 6/17/2021 Plaintiff was placed on a bus for transport to WSP. During what was to be a 4-hour drive Plaintiff was met by other Colorado inmates on the bus whom had labeled Plaintiff as a former federal agent, sex offender and snitch, said inmate stated he received the information "from that bitch McCoy" at WMCI.

The bus broke-down during the trip. Plaintiff and 6 other inmates were made to wait in the bus for 3-hours and then placed in a dog-catcher van for the remainder of the trip to WSP which took about 3-hours in the dog-catcher van. The

dog-catcher van was a van with no windows at all and a small steel-like dog-cage in it. There was no windows, no lights, and no air of any kind. Plaintiff was made to sit bent over for the entire trip as the van was not designed for transport of humans.

(C) The following events took place at WSP between 6/17/2021 and 8/20/2021, the date of drafting this amended complaint.

Upon arrival to WSP on 6/17/21 Plaintiff had not had any of his medications at all as WMCI staff stated it had all been packed the day before. Plaintiff arrived with extremely high blood pressure, dizzyness, fatigue and cranial pains associated with the high blood pressure and ace-inhibitor medication withdrawals. Plaintiff met with a nurse and was told he would receive medication within the hour. The medications were not delivered until 35-hours later. Plaintiff was forced to needlessly suffer in extreme pain.

Plaintiff was sent to Unit A, cell 2-208. Upon arrival Plaintiff was not delivered any of his property. The room Plaintiff was placed in had no air in it at all, no running ventilation system was active or working, the warden had admitted as much in a memo to staff Plaintiff obtained at a later date and mailed home. The room was covered in sand as the entire prison is built on an old mine location and there is no grass surrounding the facility, it is all dirt and sand. There was no running water at all, no toilet paper, no pillows. The mattresses are torn down both sides and the stuffing is falling out onto floor. The stuffing looks like it may have asbestos in it, small parts were sent out for testing by Plaintiff.

In effort to get water Plaintiff had to strip-down an ink pen and shape the tube like a bent straw and then ram the tube into the faucet to get water to come out of the water pipe through the pen tube in the faucet. Although Plaintiff was successful at the creation of a water tube, there was no hot water at all in the

21

room, which Plaintiff discovered was actually no hot water in the entire unit except showers.

When able to use a shower it was learned there was no place to get undressed or dressed after showers, inmates were expected to get undressed and dressed in the wet shower and to put dry clothing over wet bodies. In addition, the showers has the smell of urine and feces in them and snot on the walls. The urine and feces was due to inmates being locked out of room and denied access to toilets, the snot was due to nasty inmates and showers not being cleaned on a daily basis. Plaintiff showered on 6/18/2021, and all the way until 7/2/2021 the same smell and snot was still on the shower walls.

When it came time to eat dinner Plaintiff was denied a cup to drink with and fork or spoon to eat with and was told it was facility policy, as inmates were at WSP as punishment, and that Plaintiff not only had to purchase a pillow if he wanted one, but he had to purchase spork/spoon and cup from Warden Harlow's commissary or eat and drink with hands and fingers. (This is actually the warden's policy at WDOC/WSP)

Plaintiff was forced to eat with hands and fingers until he could order and receive a cup and spork from commissary, over a week. Plaintiff also noticed that, as punishment for being at WSP, inmates were denied anything to drink with lunch or dinner meals, serving trays were deteriorated to the point that the blue plastic the trays were made of was crumbling into the food and all food was un-sanitary as a result. Again, this, according to Warden Harlow, if punishment for inmates being at WSP.

The temperature in the rooms exceeds 90-degrees on any given day yet there is no cold water, no regular access to ice, and inmates are forced to suffer.

In addition to what has been stated thus far, Plaintiff is/was also subjected to the following unconstitutional conditions of confinement by WDOC's WSP

administration who are agents acting at the direction of and on behalf of the CDOC Defendants named herein: Plaintiff is subjected atypical and significant hardship and to and/or denied the following: access to court, access to counsel, access to pending civil and criminal legal files, denied medical care, medications, medical A.D.A. accommodations and/or restrictions, denied access to the property he lawfully possessed and had a right to possess in the Colorado prison system, placed in maximum/close custody with active violent gang members even though Plaintiff is a true 2 point, minimum custody non-gang member non-violent offender, locked down anywhere from 18 hours a day at minimum up to 46 hours in a row with no showers or toilet paper, subjected to punishment by food even though Plaintiff has committed no rule violations calling for such punishment, denied access to a toilet when needed, denied cup to drink with, denied spork/spoon/fork to eat with, denied pillow, denied clean linen as all linen has blood, feces and dirt stains on them from other inmate's usage, denied proper mattress to sleep on, denied ability to open room door and clean room and air room out (not once since 6/17/21 has Plaintiff been allowed to open his room door and clean and air it out)[this is policy here], denied access to hot water when needed, denied access to cold water when needed, denied any placed to sit and eat mealss (Plaintiff has been at WSP since 6/17/21 and not once has he been allowed to siat and eat at a table and is instead forced to eat on floors, bed, or a chair against a wall), denied access to a law library as WSP operates on an exact cite system and has no law library for inmates to go to, denied any access to legal authority from Colorado and/or other jurisdictions wherein Plaintiff has pending litigation, inadequate space to store legal files and books if owned, denied access to grievance system in both Colorado and Wyoming, inadequate cell space (Plaintiff has about 4 square feet total of living space he shares with another person while subjected to excess lockdowns that have nothing to do with COVID-19, rooms have no proper ventilation system and

rooms reach 90 plus degrees, rooms have constant unlawful illumination causing sleep deprivation, labeled as a former federal agent snitch and sex offender, subjected to WDOC allowing inmates to look Plaintiff up on Wikipedia.com to see profile and charges, subjected to monthly strip searches during cell inspection as punishment, administration says facility is overcrowded yet they still accept out of state prisoners and treat all minimum or even medium custody inmates as if they are max/close custody; warden of facility keeps facility on lockdown for any reasons he can come up with and due to what he calls staff shortages which are every weekend and at least 3 days of the week as the warden gives staff days off to go to carnival, rodeo, fairs, and/or fishing, facility is so short staffed the staff work on 12 hour shifts and come to work mean and cranky and take it out on Plaintiff and other inmates, subjected to constant PREA-VOYER violations where there are either no shower curtains or see through curtains that defeat the purposes of shower curtains, double bunking when lockdowns are constantly over 18 hours a day, denied needed toilet paper and it is not sold on commissary, denied normal out of cell activity, no programs at all, no out of cell exercise at all, no fresh air at all, food is contaminated with decaying plastic particulate from serving trays that are decaying.

This list is not exhaustive, all in all the prison is run like a 1960's county jail mixed with Pennhurst Mental Hospital which had been closed after public learned what was going on there behind closed doors.

The conditions of confinement at WDOC WSP are deplorable and extremely unconstitutional and represent clear atypical and significant hardships.

CONCLUSION OF STATEMENT OF FACTS RELEVANT TO ALL CLAIMS

While at WSP Plaintiff received legal documents from several herein named defendants. The documents reveal some of the persons whom were involved in the transfer, and then the persons whom assisted in the transfer.

The documents reveal that several defendants lied on and/or altered documents being sent to Wyoming in effort to cause a raise in classification and deny medical care and access to courts and counsel.

## E.   STATEMENT OF CLAIM(S)

### CLAIM ONE:

#### ILLEGAL SEIZURE OF PERSON AND VIOLATION OF DUE PROCESS OF LAW UNDER UNITED STATES AND STATE OF COLORADO CONSTITUTIONS AND STATUTES

(A) **Illegal Seizure Of Person:** On 5/20/2021 Plaintiff was a Colorado prisoner housed at CDOC's CSP. Under normal circumstances a state prison system may transfer its prisoners to an out of state prison system as long as the transfer complies with state statute and policy, and is not done for retaliatory or nefarious reasons. Prisoner's may not, however, be transferred to an out of state prison if that transfer would subject the prisoner to atypical and significant hardships.

On 5/20/2021 Plaintiff had a petition for writ of habeas corpus pending in the Colorado state court pursuant to C.R.S. 13-45-101.

In Colorado, C.R.S. 13-45-114 acts as a bar and prohibits state actors from transferring a prisoner out of the jurisdiction of the habeas court and/or out of state either (a) after the writ is issued, and/or (b) in effort to conceal the prisoner and/or habeas petitioner and/or to avoid the process of the writ.

On 5/20/2021, as retaliation against Plaintiff for his engaging in protected conduct and for refusing to dismiss civil right claims against a host of Colorado agents, Defendants Williams, Trani, Olson, Dauffenbach, Turner and Jacobson caused Plaintiff to be illegally transferred across state lines and outside the jurisdiction of the habeas court in violation of state statute and policy.

The transfer was retaliation, and designed to conceal Plaintiff from his counsel, the habeas court, and the U.S. District Court, Denver, Colorado.

In documents obtained by Plaintiff in July of 2021, it was discovered that Defendants Williams, Trani, Olson, Dauffenbach, Turner and Jacobson were all aware that the state court writ of habeas corpus was in fact pending and that they were barred from transferring Plaintiff out of the State of Colorado, but the defendants conducted the transfer anyway asserting they were immune from civil process for retaliation or criminal prosecution for ignoring state law.

CDOC policy requires the signature of six persons to approve an out of state transfer, the six persons whom signed off on transferring Plaintiff from CDOC to WDOC were Defendants Williams, Trani, Olson, Dauffenbach, Turner and Jacobson.

After requesting a hearing from the Court in various cases to address the transfer and loss of legal files, Defendants Dauffenbach asserted that he was aware of the pending habeas corpus case and that it was a felony to transfer Plaintiff out of state, but that he ordered it done anyway. Defendant Turner admitted that he participated in the transfer by contacting his WDOC friend, Carl Voigtsberger, and asking Voigtsberger to take custody of Plaintiff and house Plaintiff at WDOC's max security prison in Rawlins, Wyoming. Defendant Olson took part in the transfer by approving the transfer that Defendant Dauffenbach put in motion with Defendant Turner. Defendant Jacobson took part in the transfer by conducting a legal review and asserting the remaining defendants would be immune from criminal prosecution or civil suit if they proceeded with the transfer which state statute and policy forbid. Defendants Williams and Trani reviewed the transfer documents and approved them.

As state statute and policy prohibited the transfer of Plaintiff from CDOC to WDOC due to the pending habeas corpus application, defendants Williams, Trani, Olson, Dauffenbach, Turner and Jacobson violated Plaintiff's right to be free of unlawful seizure of his person and effects when they seized Plaintiff and his property and transferred him across state lines from CDOC to WDOC absent any legal

process. The seizure violated both state and federal seizure laws. Any seizure and transfer of a person by a government actor that is not done according to lawful process, is an illegal seizure and transfer.

In July of 2021 Plaintiff received government documents revealing that Defendants Weiser, Woodward, Allen, Dietze & Davis, PC lawyers, and Rogers, all took active steps in effort to conceal the illegality of the transfer and actively assisted in concealing Plaintiff from his counsel and the habeas court. This group of defendants even went as far as knowingly lying to the federal courts asserting there was no law prohibiting said transfer which they knew of, which, a lie, they previously admitted they were advised of the habeas petition and statute prohibiting transfer but wanted it done to stop litigation by Plaintiff.

Defendants Williams, Trani, Olson, Dauffenbach, Turner, and Jacobson violated Plaintiff rights under the State of Colorado and federal constitution when they subject Plaintiff to illegal seizure of his person and property and caused Plaintiff's person and property to be transferred across state lines while a petition for a writ of habeas corpus was pending which barred such transfer and when they instructed WDOC actors to conceal Plaintiff from his counsel and habeas court by denying Plaintiff the right to use a telephone to contact his counsel and by seizing all addresses required to send letters to the court or counsel.

Defendants Little, Lisac, Brandt, and Hunsaker actively took part in the illegal seizure and transfer process wherein these four defendants assisted in processing the paper work required for the transfer and then the actual seizing of Plaintiff and his property and placing same into a van to accomplish said transfer.

Defendants Little, Lisac, Brandt and Hunsaker were all aware that the transfer was barred by statute and policy, acknowledged the transfer was illegal, but completed the transfer anyway asserting they were immune.

27

**(B)** As To Violation Of Due Process Of Law Associated With The Transfer:

On 5/20/2021 while a state court writ of habeas corpus was pending which prohibited herein named defendants from causing Plaintiff to be transferred out of the jurisdiction of the habeas court, Defendants Williams, Trani, Olson, Dauffenbach and Turner caused the out of state transfer anyway and transferred Plaintiff to a state prison system without providing any due process of law.

These specific defendants assert that the transfer from CDOC to WDOC was required for Plaintiff's personal safety as Plaintiff had custody issues and refused to go to general population at any facility these defendants offered to Plaintiff, and that Plaintiff had told the CDOC offender population that he, Plaintiff, was an informant for CDOC intelligence officers. Defendants Williams, Trani, Olson, Dauffenbach and Turner were supposed to provide Plaintiff with a hearing prior to said transfer at which time Plaintiff could refute the allegation that there was no CDOC facility Plaintiff could go to or would go to and that the transfer was required for Plaintiff's safety, because it was not. These defendants refused to provide that due process hearing and gave Plaintiff no ability to refute the false and absurd claims being made to support the transfer out of state.

It is a fact that prior to the transfer the CDOC's Protective Custody Review Committee met with Plaintiff in March 2020, and in a videotaped hearing determined that Plaintiff did not need to be placed in protective custody, did not need to be transferred out of state, and there were at least five different prisons Plaintiff could go to and agreed to go to and stated his agreement to go to them during the hearing in video, CSP was one such facility.

Plaintiff had a right to a due process hearing to contest the assertion he had custody issues preventing him from being housed at any CDOC facility, and to contest the out of state transfer premised on the false assertions being made.

In documents filed with a federal court Defendants Williams, Trani, Olson, Dauffenbach and Turner claim that the idea and decision to transfer Plaintiff out of state was made in early March of 2021 "while the protective custody interview process was ongoing", but this was a lie.

These defendants claim the out of state transfer process was began in March 2020 while the protective custody review was ongoing, but the fact is that the protective custody interview took place in April 2020 but the defendants claimed they made the decision to transfer in "early March 2020".

As these defendants claimed the transfer out of state was required for protective custody and safety issues of Plaintiff, and that Plaintiff refused to go to the prisons offered in Colorado and allegedly told prisoners he was an informant, as the transfer was "allegedly" based on these reasons, Plaintiff had a due process right to a hearing at which time he was able to refute these claims.

Plaintiff was given no due process in the decision to transfer him out of state based on his own personal safety, nor opportunity to make a record revealing that Defendants Dauffenbach and Turner were lying about the reasons for the transfer.

Plaintiff had a state and federal right to be free from seizure of his person and to receive due process of law as it applies to being transferred from one state to another for alleged safety reasons if the safety reasons state actors asserted did not in fact exist and were made up in effort to cause a transfer for other nefarious reasons. The defendants named herein Claim One have violated Plaintiff's state and federal rights as they apply to illegal seizure and denial of due process of law.

CLAIM TWO:

RETALIATION FOR ENGAGING IN PROTECTED CONDUCT

DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS BY DENYING MEDICAL CARE

(A) As to Retaliation for Engaging in Protected Conduct:  Plaintiff has several civil complaints pending before state and federal courts. In the U.S. District Court, Denver, Colorado, Plaintiff has, Vreeland v. Tiona, 17-CV-01580-PAB-SKC; v. Huss, 18-CV-00303-PAB-SKC; v. Vigil, 18-CV-03165-PAB-SKC; v. Olson, 20-CV-02330-PAB-SKC; and v. Polis, 20-CV-02420-PAB-SKC.

In the cases listed, herein named Defendants Polis, Weiser, Woodard, Allen, Williams, Olson, Dauffenbach and Jacobson are named in those cases.

Prior to filing Vreeland v. Polis, Plaintiff was threatened by state actors at CDOC/AVCF and reported the threats to the Colorado Inspector General's Office, and the federal courts. The threats consisted of threats to have Plaintiff transferred from the facility he was at, to having Plaintiff transferred out of state, to altering Plaintiff's parole release dates, to subjecting Plaintiff to physical harm and denials of medical care, most of this came from Huss and his wife and their state actor friends.

After suing Huss, Huss's wife engaged in conspiracy with CDOC actors and (i) caused Plaintiff's parole eligibility date ("PED") to be altered from 2024 to 2144, and then (ii) Huss, acting in concert with his wife, defendants Dauffenbach, Jacobson, and Daigle, all together caused Plaintiff to be moved to seven different prisons in a 72-days period and kept Plaintiff on lockdown the entire time and seized his legal materials so he could not access the courts or properly litigate his cases.

Eventually Plaintiff landed at CDOC's CSP in Canon City, Colorado.

Once at CSP Plaintiff began to gather new copies of case files and obtained an order from the court to obtain access to his tablet computer to get legal

materials of of it so Plaintiff could get caught up in his litigation and complete discovery responses in Tiona case.

While at CSP Plaintiff was subjected to various unconstitutional conditions of confinement such as denials of medical care and others. Plaintiff began to report these issues to the courts.

Between April 21, 2020, and May 19, 2021, Plaintiff received various threats from CSP staff and from inmates passing word onto Plaintiff from CSP staff, that if Plaintiff did not stop his litigation and grievances he would in fact this time be moved out of state by CDOC in effort to stop the constant litigation.

As a result of the threats Plaintiff's lawyer, family and friends started contacting herein, defendants Polis, Weiser, Woodward, Williams, Dauffenbach, Little and Lisac. The threats being made in regards to denials of medical care and transfers were discussed at length. To Plaintiff's lawyer, family and friends Defendants Dauffenbach and Lisac were made the point persons for answering all questions and addressing all matters related to threats. Defendants Dauffenbach and Lisac advised Plaintiff's lawyers, family and friends by email, and recorded telephone calls that (i) the medical care was going to be provided to Plaintiff at CSP; (ii) the threats were baseless rumors and Plaintiff was not being transferred, he would remain at CSP, receive medical care, and then a job assignment. These two defendants assured that there was no plan to transfer Plaintiff.

Plaintiff then, not believing anything Dauffenbach and Lisac were saying, filed a motion in Vreeland v. Vigil seeking a court order under Fed.R.Civ.P. Rule 65 for injunction. Plaintiff requested the Court issue an order prohibiting any transfer of Plaintiff to any facility other than CSP or CTCF so medical issues could be addressed, and to put an end to threats and to prevent more of the 72-days 7-different prison transfer process starting again as Plaintiff was still

31

being yelled at by CDOC staff over lawsuits and grievances.

In response to the motion to the court, defendants Weiser, Woodward, Dauffenbach and Lisac advised the court in Vigil ECF 102 that Plaintiff was sent to CSP for his safety and that he would remain there, would receive all medical care, and then a job assignment.

After defendants advised the court that Plaintiff would remain at CSP and would receive medical care and then a job, Plaintiff sat and waited for the medical care and job assignment. Plaintiff learned that Correctional Healthcare Management, CDOC medical insurance provider, had approved payment for any and all medical care, testing, medications and surgeries which Plaintiff required, all that was needed was for the medical staff to conduct, order and schedule it all.

After new years 2021 Plaintiff spoke to defendant Lisac and Boyd and asked when the medical care and surgeries and medications specifically for (a) epididymal tumor, and (b) spinal damage, and (c) incisional hernia was going to be provided. Defendants Lisac and Boyd advised that medical care was being scheduled and would take place soon, and stated that it was delayed due to COVID-19.

The first week of April 2021 Plaintiff discussed the medical care issues with Lisac and Boyd again. Plaintiff received the answer that COVID-19 had prevented the scheduling of any off-site medical procedure for all CSP inmates. Plaintiff then advised that he had sworn declarations from seven different CSP inmates whom had been sent out for medical testing and surgeries between April 2020 and April 2021. Defendant Lisac and Boyd assured Plaintiff "you will be dealt with soon".

On May 18, 2021, U.S. Magistrate S.K. Crews held a preliminary scheduling conference in Vreeland v. Huss. The court granted Plaintiff's request to conduct six oral depositions after Plaintiff advised he had a list of names to depose associated with the Huss case, i.e., defendants Huss, Dauffenbach, Jacobson, Lisac, Davidson, Daigle. Plaintiff advised the court that he was in process of

possible re-sentencing, if that caused his release he would most likely be dismissing a list of cases and parties, and wanted to talk to defendant Huss's lawyers about it.

After the hearing ended on 5/18/2021, Plaintiff spoke directly to defendant Allen and advised that, if the Attorney General's Office did not object or impeed the deposition of R.M. French, the former sheriff whom planted evidence against Plaintiff in his criminal case, Plaintiff would dismiss the case against Huss. The telephone call was recorded and another lawyer named Vilner was on the line. The lawyers stated they would not object or impeded that deposition. Plaintiff advised that his lawyer, Mr. Griffin, would conduct the deposition and would arrange for all person to attend, including this Plaintiff.

After that 5/18/21 telephone conference ended, and after Plaintiff advised his lawyer that the A.G.'s Office would not impeded the deposition, hours later a man called a C.M. 3, (case manager 3) approached Plaintiff at the CSP D-Unit soda machine to discuss the civil cases and depositions. The man, stated, "I just spoke to the A.G. on the case. There's not gonna be any settlement of any kind with you. I'm telling ya now, your gonna stop all this complaining and dismiss these cases or your gonna be transferred out of here immediately to someplace real nasty."

Plaintiff advised he had now changed his mind, he was not dismissing the Huss case for anything, he was completing all depositions he requested, he was not dismissing anything, asked to have the position emailed to the Court, advised he would tell his lawyer and court, and walked away.

Less than 48-hours after the Vreeland v. Huss preliminary scheduling conference the very persons the court granted permission to Plaintiff to depose, caused Plaintiff to be packed up in the middle of the night, placed in a van, and illegally, without any lawful process, transferred Plaintiff to the WDOC.

The transfer from CDOC to WDOC was in fact retaliation. The transfer was in

fact discussed by and then approved and implemented by Defendants Williams, Trani, Olson, Dauffenbach, Turner and Jacobson. The transfer, designed to punish Plaintiff for engaging in protected conduct, to stop depositions in all case, to prevent any attempt to depose Williams, Dauffenbach, Olson or Jacobson was put in place by the very persons Plaintiff was suing and preparing to depose.

After the transfer Plaintiff was able to obtain testimony and documents revealing that: (a) the transfer was in fact put in place because of the civil suits, (b) documents and email printing served to the federal court were actually created and fabricated in effort to try and convince the court the transfer had been in place since March 2020.

With the evidence and testimony Plaintiff has now received he can prove without doubt, and will provide testimony from one Colorado law enforcement official, and one Colorado lawyer, that the transfer was retaliatory and due to civil litigation, and that documents served to the court were fabricated all in effort to conceal the retaliatory transfer of Plaintiff by herein named defendants.

Defendants Williams, Trani, Olson, Dauffenbach, Turner and Jacobson retaliated against Plaintiff for his engagement in protected conduct, and in effort to stop, impede, frustrate and hinder access to court and depositions of themselves by Plaintiff, they caused Plaintiff, a Colorado prisoner of 16-plus years, 2-points, minimum security living in a trustee/incentive unit whom had never had any misconduct reports, to be transferred into the WDOC's WSP and placed on total lockdown with complete denial of access to law library, court, counsel and case files. As it turns out, this is not the first time this group of defendants has engaged in this type of conduct in transferring an inmate to retaliate and stop litigation against them.

On July 2, 2021 two WDOC/WSP staff advised Plaintiff that he was specifically

placed at WSP on lockdown at the direction of Dauffenbach and Turner.

On August 20, 2021 Plaintiff was met by a different WDOC/WSP staff member whom was not working at the WSP in July 2021, and that staff member advised that a conversations was had with WDOC's Voigtsberger, (Defendant Turner's friend at WDOC) and he advised that Dauffenbach and Turner specifically requested that Plaintiff be sent to WSP, locked down and denied access to his counsel until at least August 25, 2021 or longer if possible. Plaintiff then received a written document confirming this fact.

The transfer from CDOC to WSP was retaliation. But for the grievances, civil litigation and granted depositions, the transfer would have never taken place.

Defendants Williams, Trani, Olson, Dauffenbach, Turner, and Jacobson retaliated against Plaintiff for engaging in protected conduct and caused Plaintiff to be illegally transferred out of the state of Colorado to stop litigation and depositions against them, and to conceal Plaintiff from his counsel and the habeas court and to avoid the writ.

Defendants Weiser, Woodward, Allen, Rogers, Little, Lisac, Brandt and Hunsaker assisted in the retaliatory transfer and attempt to cover it up. Weiser, Woodward, Allen and Rogers assisted by knowingly serving to the court fabricated backdated documents to make it appear the transfer had been put in place in March of 2020 when it was not. Defendant Little, Lisac, Brandt and Hunsaker assisted with the retaliation by conducting the seizure of Plaintiff from his room at CSP, and, by placing him in a van for transport to WDOC in violation of state and federal law when they knew the state statute and writ forbid it, and knew it was for retaliation.

Defendant Polis was made "personally aware" by telephone, letter, email and his own attorney of record of the threats, constant retaliation, denials of medical care, and seizing of Plaintiff's legal materials by his agents, and why

they were doing this. Polis had the power and duty to put a stop to an unconstitutional pattern of actions taken by his agents against Plaintiff. Defendant Polis, being aware of the fact and having the power to put an end to unconstitutional acts and conditions, refused and failed to take any action to stop it and allowed it to continue.

**(B). As to Deliberate Indifference to Serious Medical Needs By Denying Medical Care:** (a) Plaintiff was transferred to CDOC's WSP and into the custody of Defendants Little and Lisac on 4/13/2021. Plaintiff's primary medical care provider then became Defendant Boyd. Upon arrival to CSP Plaintiff discussed his medical conditions with Little, Lisac and Boyd. The three defendants assured that Plaintiff would in fact receive pain medication and management, medical exams, treatment and any surgeries needed. Plaintiff filed a request for Rule 65 relief in Vreeland v. Vigil, at al., 18-CV-03165-PAB-SKC. In that motion Plaintiff requested the Court order CDOC to stop transferring Plaintiff and to leave Plaintiff at either CSP or CTCF and transfer Plaintiff to no other prison until the medical care and surgeries were completed.

Defendants Weiser, Woodward, Dauffenbach and Lisac advised the court in Vigil at ECF 102 that they had discussed the medical issues with Plaintiff, and that Plaintiff would in fact remain at CSP and receive that medical care.

Plaintiff was then held at CSP from April 13, 2020, until May 20, 2021, and that medical care was never provided and Plaintiff was forced to suffer in needless pain while waiting for the medical care these defendants swore to the Court they would provide while Plaintiff was at CSP. For over one year Plaintiff sat at CSP and suffered in pain. His spinal damages worsened; his epididymal tumor worsened; his incisional hernia worsened, yet no medical care was provided to Plaintiff by these defendants as they swore to the Court they would provide.

(b) After sitting at CSP for over one year waiting for promised medical care

to come which never came, and after suffering in needless pain all that time, Plaintiff was transferred to WDOC. Upon arrival to WDOC Plaintiff asked for and was denied medical care for the exact same three medical issues, i.e., spinal damage, epididymal tumor, incisional hernia. The WDOC medical staff asserted that CDOC's agent, herein Defendant Boyd, asserted Plaintiff did not require any medical care at all and his only issue was that he was waiting a consult for epididymal tumor/cyst, as such Plaintiff was denied medical care and medications by WDOC.

In July 2021 Plaintiff received a copy of medical documents Defendant Boyd served to WDOC's Classification Manager and medical department associated with Plaintiff's true medical needs. The documents revealed that Defendant Boyd had personally altered the medical documents in effort to prevent WDOC staff from seeing the true nature of Plaintiff's medical needs so WDOC would not reject Plaintiff being transferred there based on medical reasons.

The alteration of the medical documents is shocking and the way it was completed reveals that Defendant Boyd did the alteration, and she did it to assure the transfer took place and was not denied for medical reasons. That alteration of medical files caused WDOC to refuse to grant medical care to Plaintiff and causes Plaintiff to suffer needlessly in pain waiting for the issues to be resolve in a court of law.

CLAIM THREE:

VIOLATION OF ACCESS TO COURT AND COUNSEL UNDER STATE AND FEDERAL
CONSTITUTIONS AND STATUTES

On 5/20/21 Plaintiff had pending before the state and federal courts the
following matters; U.S. District Court, Denver: Vreeland v. Tiona, Vreeland v.
Huss, Vreeland v. Vigil, Vreeland v. Olson and Vreeland v. Polis.: U.S. Court of
Appeal 10th Circuit: Vreeland v. Schwartz, Vreeland v. Raemisch, Vreeland v.
Huss.: U.S. District Court, Tallahassee: Vreeland v. Pruitt.: U.S. Court of
Appeals 11th Circuit: Vreeland v. Warden.: U.S. Court of Appeal District of
Columbia: Vreeland v. China.: Douglas County District Court, Castle Rock,
Colorado: People v. Vreeland/Vreeland v. People, habeas and post-conviction
petition.: El Paso County District Court: Vreeland v. Isenstadt, Vreeland v.
Raemisch.: Jefferson County District Court, Colorado: Vreeland v. Tondre.:
Colorado Court of Appeals: Vreeland v. Mulligan, Vreeland v. Isenstadt.

Of the cases listed, Plaintiff was pro se on all but three cases, Tondre,
Mulligan, and the habeas corpus petition in Douglas County.

While at CDOC's CSP Plaintiff was litigating these cases and after having all
case files seized by CDOC actors as stated in Vreeland v. Polis, et al., 20-CV-
02420-PAB-SKC, Plaintiff managed to pay to have all case files reproduced. The
total case file content was approximately four cubit feet, and/or 250 pounds of
paper.

(A) **Access to Court Violations**: On 5/20/21 Plaintiff was illegally transferred out
of the State of Colorado and into the State of Wyoming absent any lawful process.
State statute and policy were not complied with in the transfer process. Upon
transfer, upon belief, all of the case files were placed in the same van Plaintiff
was placed in. Plaintiff did not see the materials being pack and at this time is
taking defendants' word for it. Upon arrival to WDOC all case files vanished. WDOC

blamed CDOC, CDOC blamed WDOC. To the best of Plaintiff's information knowledge and belief, WDOC WMCI actors lost Plaintiff's case files by (i) admittedly intentionally throwing in the trash Plaintiff's white legal box that contained all current up to date files, the officer admitted to Plaintiff he threw this material away; and (ii) Plaintiff's property, papers, books and electronics, were first marked and etched with another inmate's number on them/it and given to that inmate, attempts to get all the materials back was not successful, allegedly as told by WMCI staff.

As a result of the illegal retaliatory transfer that Defendant Dauffenbach and Turner admit they caused, all of Plaintiff's legal case files vanished and Plaintiff was unable to litigate the cases listed herein as he had no access to the case files, no ability to obtain a new copy of the files, and was being actively and intentionally denied access to his lawyer of record as addressed in section (B), of this Claim Three. As a result of the loss of the legal files Plaintiff suffered the following violation of access to courts and injury to cases listed:

Cases Tiona, Vigil, and Huss were all administratively closed by the court. These cases all represented valid non-frivolous legal claims, both the Tiona and Huss cases were already at the discovery and/or summary judgment stages. The Vigil case was at the Rule 12 stage but the defense had not moved to dismiss all claims in the complaint, just parts of them. The Tiona and Vigil cases sued for immediate medical care, as a result of the administrative closure due to illegal transfer and loss of case files, Plaintiff's valid claims for medical are closed and he is now denied medical care and forced to suffer in needless pain.

In the USCOA, Raemisch case Appellee filed an opening brief, Plaintiff was moved and prevented from filing a reply, the Court then accepted the appellee argument as Plaintiff failed to reply to counter it and the case was lost. The

Schwartz case was dismissed as well, the USCOA relied and cited to numerous incorrect factual issues in the case in dismissing the appeal. In these two USCOA cases, as a result of the transfer, (i) Plaintiff was not able to serve reply brief in Raemisch, and (ii) Plaintiff was given no ability to file a motion for panel rehearing to point out the incorrect assertion which were clear as (a) he was not given time due to transfer, and (b) he had no case files to cite to.

In the 11th Circuit cases, the cases were closed for failing to serve fees and cost form and opening brief. Plaintiff could do neither as he had no files to work from and no addresses to write to ask for time and no access to counsel or family in the time period so seek assistance. In the Colorado habeas case, on April 30, 2021, the court granted access to suppressed exculpatory evidence that was hidden by the state for 16 years. The court gave 45-days for Plaintiff to meet with his lawyer, review the evidence and to serve an amended habeas application that cited specifically to the new evidence.

As a result of the transfer (i) Plaintiff was not allowed to review the evidence with counsel and show him the recordings needed out of 10,000; and (ii) the amendment was completed without any input from Plaintiff and without counsel and Plaintiff being able to cite specifically to that new evidence as the ability to review and cite to it was taken from Plaintiff by the illegal transfer and the denial of access to counsel.

Opening briefs and notice of appeals were due for Isenstadt and Raemisch cases in state court, both of these were blocked.

WDOC acts as agents of CDOC as far as accepting an CDOC inmate for housing within the WDOC system. CDOC's WDOC agents caused all Plaintiff's legal files to vanish which caused actual injury to all cases.

Plaintiff claims that as a result of the illegal and retaliatory transfer, that Defendants Dauffenbach and Turner admit they caused, Plaintiff's rights to

access the court as to all cases cited herein was violated by Defendants Polis, Weiser, Woodward, Allen, Williams, Trani, Olson, Dauffenbach and Turner.

Additionally, this claim is brought under state law. C.R.S. 13-45-114 was a bar to the transfer of Plaintiff from CDOC to WDOC. Each Defendant named herein, except Polis, was aware of the pending state habeas application and state statute barring any transfer, yet they caused the transfer anyway.

Plaintiff claims as follows: (1) But for the illegal retaliatory transfer, the loss of the legal material's would not have taken place and the damages done to the above cases would not have taken place; (2) WDOC actors are agents of CDOC and their causing the loss of the legal files places liability on CDOC actors Williams, Trani, Olson, Dauffenbach and Turner as they caused the illegal transfer, approved the illegal transfer, and specifically chose WDOC as the transfer location.

(B) **Denial of Access to Counsel:** Plaintiff has a right under the federal constitution to communicate with his counsel of record. Plaintiff has a right under Colorado statute to communicate with his counsel of record.

Plaintiff was illegally transferred to WDOC on 5/20/2021 by the CDOC defendants listed in this Claim Three. Since the date of arrival at WDOC, WDOC agents assert that defendants Woodward, Dauffenbach and Turner requested that Plaintiff not be allowed to communicate with his counsel, not be allowed to place counsel's telephone numbers on Plaintiff inmate calling list as all other inmates are allowed to do, and not be given any privileged communication with counsel for any reasons at least up to the end of August, 2021.

Since Plaintiff arrived at WDOC on 5/21/2021, Plaintiff has in fact been denied the right to place his attorney's telephone numbers on Plaintiff's inmate telephone calling list as all other inmates are allowed to do. Plaintiff has not been allowed to call his attorney even one time since 5/20/2021, and Plaintiff has

been denied any and all forms of privileged communication with his counsel.

The damages associated with the denial of access to counsel are immense. Plaintiff has paid over $400,000.00 in legal fees in effort to obtain illegally suppressed exculpatory evidence for use in a habeas corpus application and post conviction petition. After paying all that money the denial of access to counsel has prevented the use of said evidence as the time to obtain, review and plead said evidence has come and gone and is forever lost in the state court system.

For the reasons stated, Plaintiff's rights to access the courts and counsel have been violated, and Plaintiff has suffered actual injury to his cases and loss of hundreds of thousands of dollars of paid legal fees, and loss of valid judgment awards.

**CLAIM FOUR:**

**VIOLATION OF DUE PROCESS AND EIGHTH AMENDMENT CONDITIONS OF CONFINEMENT**

Plaintiff has a protected liberty interest in avoiding particular conditions of confinement. Sandin v. Conner, 515 U.S. 472. Plaintiff enjoys a liberty interest under the Due Process Clause to be free from restraint that "imposes atypical and significant hardship on Plaintiff in relation to the ordinary incidents of prison life. Sandin, 515 U.S. at 484. In considering whether defendants have imposed an atypical and significant hardship on Plaintiff, the courts consider the conditions of confinement, including both the duration and degree of restrictions as compared with other inmates. See Perkins v. Kan. DOC., 165 F.3d 803, 809 (10th Cir. 1999).

Plaintiff claims that he has been subjected to atypical and significant hardship by Defendants Polis, Weiser, Williams, Trani, Olson, Dauffenbach, Turner, Jacobson, Woodward, Allen, Rogers, Little and Lisac when together they made a wilful decision to break state and federal law, violate Plaintiff's rights, retaliated against Plaintiff and transferred Plaintiff to WDOC in spite of state

law prohibiting said transfer. (C.R.S. 13-45-114): Plaintiff asserts that these defendants are responsible for providing Plaintiff access to court, access to counsel, humane living conditions, and are responsible to guarantee that WDOC, acting as CDOC's agent as a receiving state, has the ability to, and will provide for access to court, access to counsel and humane living conditions.

Plaintiff was transferred from CDOC on 5/20/2021 to WDOC's WMCI and then on 6/17/21 to WDOC'S WSP. Since arrival on 5/20/2021 Plaintiff has been subjected to the following unconstitutional conditions of confinement;

CDOC kept all of Plaintiff's inmate funds in his bank account and refused to transfer them to WDOC for Plaintiff's use upon arrival as he could not pay for them. Plaintiff was forced to go without soap, toothpaste, deodorant and basic hygiene items for over 10-days upon first arrival. Plaintiff has been denied any and all communication with his lawyer of record. Plaintiff is not allowed to place his lawyers, friends and families' telephone numbers on his inmate telephone calling list as all other inmates are allowed to do, Plaintiff has been allowed one number, his mothers cell phone and no more. All Plaintiff's legal materials vanished. Plaintiff's TV and RADIO were seized, and he was told to buy new ones from WDOC commissary if he wanted them. All plaintiff's clothing was ruined. It was all washed, but not dried and then placed in plastic bags for over 30-days and mildewed and required Plaintiff to replaced it all. Plaintiff's personal towels and washcloths were seized, they were replaced with used items that have blood, feces and other stains on them from being used by other prisoners. Plaintiff was issued linen that were used and stained with blood and other human stains he will not name here.

Plaintiff is denied access to court, access to law library. WSP has no law library and operates on an exact cite system only. WSP offers 2 computers for 80 men to use to look up Wyoming law and some federal law and refuses to provide any

Colorado or other state authorities to Plaintiff. The 2 computers, used by 80 people, can only be used when the facility is not on lockdown. Plaintiff is under constant excessive lockdown. Plaintiff is locked down from at minimum 20 hours a day all the way up to 46 hours continuous with no access to showers, toilet paper or hot water or the computers to do legal work.

Plaintiff arrived with 12 required medications that were not set to expire until 2022. All but 3 medications were cancelled and Plaintiff is forced to suffer in pain. WSP medical, Dr. Levene, told Plaintiff that WSP doesn't treat chronic pain. Plaintiff is denied his A.D.A. and/or medical restrictions, lower bunk and/or lifting and medical appliances such as brace and mattress. Plaintiff is denied a pillow and mattresses are all split down the sides and stuffing is falling out.

Of all property Plaintiff left Colorado with, only a few books, broken typewriter, shoes and shorts were returned to him. Plaintiff is housed in a maximum security prison and treated just like a maximum security prisoner. There are no programs at all. No out of room exercise facility to go to, yard and gym are sometimes given for up to 40 minutes every few days. Plaintiff is housed in a unit designed for 40 inmates but there are 80 inmates in the unit. Since arrival at WSP on 6/17/2021 Plaintiff has not been allowed to eat even one meal at a table with a chair, he is forced to eat on his bed, or his floor or in a chair against a wall in the day room with food tray on floor. The day room designed for 40 men has 80 men in it. There is no room to move or breath.

Plaintiff is denied a cup to drink with and spork/fork/spoon to eat with at all meals unless he purchases them from commissary with his money, becasue, if these items are wanted the inmate must buy them from WSP or eat with fingers. Food service serving trays are so decayed that the blue plastic they are made of is decaying so bad the blue plastic particulate is in the food you eat which causes

choking and stomach problems.

Plaintiff is locked in a room for at least 18 hours a day and is not allowed to open the door and even clean the room. Since 6/17/2021 Plaintiff has never been allowed to open his room door, air it out and clean the room. Plaintiff, during the times he is allowed out of his room, is locked out of the room and denied access to toilets. If toilet use is requested you are punished by being locked back inside your room for at least 30-minutes. The rooms have no hot water at all. Medium and minimum custody non-violent inmates are subjected to max and close custody inmates and gang members' all in one room and subjected to violent murderers whom want to run the units. Telephones are broken and 80 men must share 4 phones. When showering there is no place to get undressed and then dressed. Inmates must get in shower, remove clothing, shower and then put clean clothes on wet bodies while standing in the wet shower. Showers are nasty, inmates urinate and defecate in them as they are locked out of their room and not granted access to toilets without punishment.

The prison has a kitchen and dining area, the warden refuses to use it, has been this way before COVID-19, hence the meal and eating conditions. There is no placed to store property in a suitable fashion.

Plaintiff is denied access to both CDOC and WDOC grievance system so he may not grieve an issue and/or exhaust it. Plaintiff lives in a room with a 300 pound person on lockdown with inadequate cell space as complained of in Ramos v. Lamm. In fact, the living conditions at WSP are just as bad as those cited in Ramos v. Lamm.

While locked in the room for 18 to 46 hours at a time, sometimes longer, the heat is over 90 degrees. There is no proper running ventilation at all in the rooms. There is no cool air at all, if you move in the room at all you start to drip sweat, you sleep and lay in your own sweat and funk from the heat.

The rooms lights do not turn off at all so you suffer sleep and sensory deprivation.

Staff allow inmates to look Plaintiff up on Wikipedia to see his charges and have labeled Plaintiff as a former federal agent, sex offender and snitch.

Staff conduct strip search of inmate during normal cell inspections just to harass inmates. Inmates are even woken at 10 or 11 or 12 at night and told to strip. These searches are done in front of female staff and other inmates and are illegal and degrading.

Showers do not comply with PREA VOYER laws. Showers either have no curtains at all, or have curtains that everyone can see through, including female staff.

The warden at WSP allows staff to take off any day from work they want and then locks-down the prison under the guise of lack of sufficient staff. This is a constant thing. The facility is on lockdown as a result of the warden allowing staff to take days off, at least 5 of every 7 days, and every weekend you are on lockdown no matter what.

The facility is totally overcrowded and reveals a serious safety risk to society, staff and inmates. The warden has revealed a mind set, demonstrating he does not care for inmate rights or law or constitutional mandates, and disregards them all.

As to the medical care Plaintiff is being denied, this is partially explainable. WDOC/WSP has a convicted criminal as its chief medical officer and only inmate doctor. The Wyoming Supreme Court has labeled the doctor as a liar, a drunk, and states she has serious personality problems. As example see Levene v. Levene, 340 P.3d 270; 2014 WY 161. This woman has bounced from state to state and gotten in criminal trouble with heer drinking and drug use and WDOC/WSP uses her as the prison doctor whom has denied Plaintiff medical care and medications.

Inmates reguarlly go without toilet paper and are locked down so showers

cannot be used, and toilet paper cannot be purchased on commissary or from the facility.

Although this list is not exhaustive, these are some of the extreme conditions of confinement Plaintiff is subjected to and currently living under at WDOC's WSP.

Defendants Williams, Trani, Olson, Dauffenbach and Turner have subjected Plaintiff to extreme atypical and significant hardships, unconstitutional and illegal living conditions, and have violated Plaintiff rights to due process and subjected Plaintiff to violations of his Eighth Amendment rights to be free of cruel and unusual treatment and punishment. These Defendants are required to assure that the facility they house a prisoner in, whether in Colorado or out of Colorado, does not subject inmates to these conditions of confinement.

CLAIM FIVE:

FORFEITURE OF JURISDICTION OVER PLAINTIFF AND HIS CRIMINAL SENTENCE

Under normal circumstances a state prison system may transfer an inmate from its system to an out of state prison system for service of sentence. No federal law prohibits a state from transferring its prisoners to another state for service of sentence. However, state and federal law do require that the custodian of the prisoner being transferred, and the transfer itself, comply with state statute and policy. Federal courts have held since the 1960's, if a sending state transfers a prisoner to a receiving state in violation of the sending state's statutes or policies, the sending state forfeits jurisdiction over the transferred prisoner and has no right thereafter to demand the receiving state incarcerate the transferred prisoner, nor a right to demand the transferred prisoners return to the sending state to complete the sentence the transferred prisoner was serving.

In this matter Plaintiff was housed in the CDOC based on a sentence of a Colorado court. Defendant Williams was Plaintiff's lawful custodian up to and

until 5/20/2021. On 5/20/2021 Defendant Williams forfeit jurisdiction over Plaintiff when Defendant Williams ignored State of Colorado statute C.R.S. 13-45-114, and CDOC policy, and transferred Plaintiff outside of Colorado to Wyoming while a writ of habeas corpus was pending for Plaintiff's release, and effectively concealed Plaintiff from his family, counsel and habeas court in effort to retaliate against Plaintiff for the filing of grievances and lawsuits against his agents, and to conceal Plaintiff from the habeas court and to avoid the civil process and the writ.

Due to the transfer of Plaintiff from Colorado to Wyoming while state law forbid it and made it a felony, and as Defendant Williams refused to comply with state statute and policy as it pertained to the transfer of Plaintiff to Wyoming on 5/20/2021, Defendant Williams and the State of Colorado as an judicial entity has forever forfeit jurisdiction over Plaintiff's person and the sentence imposed in Colorado against Plaintiff and Defendant Williams and the State of Colorado no longer have any lawful right or jurisdiction to demand Wyoming continue to incarcerate Plaintiff under the Colorado sentence, nor a right to demand Wyoming return Plaintiff to Colorado to retake jurisdiction and demand Plaintiff complete that Colorado sentence.

The Court and parties may look to C.R.S. 13-45-114 making it a felony to transfer Plaintiff while the habeas application was pending. Clearly Defendant Williams did not comply with state statute or policy when he disregarded this statute and transferred Plaintiff regardless of statute forbidding it. The Court and parties may then look to cases such as Hunt v. CDOC, 985 P.2d 651; 199 Colo. LEXIS 809, section (I), ¶18, where the Colo. S. Ct. cited Crady v. Cranfil, 371 S.W. 2d 640 (Ky. 1963) and acknowledged Colorado can forfeit jurisdiction of a prisoner by transferring the prison without complying with state statute and policy.

The case leads to various others to be litigated later such as Shull v.

48

Wingo, 446 S.W.2d 645 where the Kentucky Court of Appeals said that Rayborn, Thomas, and Davis all stand for the proposition that the state forfeits its jurisdiction when authorities release a prisoner to another state without following proper administration or statutory procedures. The Sixth Circuit Court of Appeals cites to these case and agrees that jurisdiction can be forfeit as stated herein.

Although Plaintiff has no access to a law library, with what limited access he had to legal citation he was able to find cases making it clear that a transfer of a prisoner to another state to serve sentence is legal, but if the custodian fails to comply with state statute or policy, the sending state forfeits jurisdiction over that Prisoner.

As the transfer here was illegal, Plaintiff moves the Court to grant relief by way of Declaratory Judgment, and declare a state can forfeit jurisdiction over a prisoner when the state transfers a prisoner to another state without complying with, and or in violation of state statute and policy and that the State of Colorado, in this case, has forfeit jurisdiction over Plaintiff as a result of the illegal transfer which did not comply with and did in fact violate state statute and policy and federal due process of law.

Plaintiff does not ask the Court to order his release, rather, just for the Declaratory Judgment which can be used at a later proceeding if need be.

CLAIM SIX:

VIOLATIONS OF DUE PROCESS AND PROTECTED LIBERTY INTEREST

As a general matter Plaintiff has no administrative remedy available to him to address the issues raised in this claim. He is denied access to the CDOC grievance system, the only alternative is to file a state court civil complaint, as such, Plaintiff asserts all claims here and moves the Court to accept supplemental jurisdiction over any state law claim as these claims are all part

and parcel of the illegal transfer which caused the underlying complaint.

(a) Plaintiff is a true minimum security, 2-point security prisoner whom has never had even one misconduct report in the 16-plus years he has been incarcerated. Plaintiff was living in an incentive unit at CSP because the single room and privileges he earned at AVCF were taken from him as retaliation for filing suit as asserted in Vreeland v. Polis.

Plaintiff has now been transferred to an out of state prison which is designed specifically for punishment and max/close security prisoners. Plaintiff is living in the WDOC's WSP and is on lockdown equivalent to the standard administrativ segregation prisoner.

Plaintiff has no misconduct reports, and had a right to a hearing before being locked-down so he could be told why he was being transferred, why he was being locked-down, and to have an opportunity to challenge that process before it took place. Plaintiff has been denied any and all chance to challenge the transfer and lockdown. The transfer and lockdown represent atypical and significant hardship upon Plaintiff due to the conditions of confinement he is now subjected to, and his right to due process has been violated.

Defendant Dauffenbach and Turner have admitted they began the process for the transfer and were responsible for having all other defendants agree with it or sign and approve it. Defendant Dauffenbach and Turner denied Plaintiff due process of law in the transfer process and subjected Plaintiff to atypical and significant hardship.

(b) Plaintiff had between six and eight hundred dollars in his CDOC inmate account and about one hundred dollars on his inmate telephone. When transferred from CDOC to WDOC CDOC actors seized and kept Plaintiff's money. CDOC actors did not forward the money and have given no reasons for its seizure or reasons for failing to send the money with Plaintiff. Defendant Dauffenbach and Turner were

responsible for completing the transfer documents and Plaintiff's money and property and for having Plaintiff's money sent to WDOC with Plaintiff the day Plaintiff was transferred. Defendant Dauffenbach and Turner instead allowed Plaintiff's money to be seized by CDOC actors and never returned to Plaintiff. The seizure of said funds violated due process of law.

(c). Upon transfer to WDOC from CDOC Defendant Turner intentionally lied on state documents to cause Plaintiff additional harm and sent to WDOC documents advising WDOC that Plaintiff had "an escape history". Turner also asserted that Plaintiff was an institutional security disciplinary problem. Turner also asserted Plaintiff was claiming custody issues within CDOC and refused to be housed in general population. Turner went on to advise WDOC that Plaintiff was labeled a "snitch" while in the Douglas County jail (in 2006) and that the snitch jacket and details of Plaintiff's crimes were causing Plaintiff safety issues in CDOC.

Each of these issues (i) required a hearing be provided for Plaintiff to dispute them, and (ii) they are completely and knowingly false, and intentional lies told by defendant Turner designed to cause Plaintiff harm. Defendant Turner, as an alleged "intelligence supervisor", working for CDOC for many years, knew that his statements were false and knew what the impact would be on Plaintiff's security, housing assignment and program / job assignment within WDOC upon arival.

Turner knew this false information was extreme, serious, and would cause major problems for Plaintiff at WDOC that Plaintiff would have no way to correct, and that Plaintiff would be subjected to atypical and significant hardship as a result of this knowingly, intentionally false information being provided to WDOC actors by defendant Turner.

Plaintiff had been in CDOC for 16 years and had never had an escape attempt, had no escape history, and had no institutional misconduct reports. Vreeland never had security issues related to his crime nor any said label placed on him from the

county jail. The absurdity of the assertion by Turner is seen in the fact that Plaintiff had not been in the county jail since 2008, if that snitch label was an issued for CDOC, why was it not addressed in 2008, why was it left to be addressed in 2020.

Turner also gave WDCO an incorrect parole eligibility date. All of this information impacted Plaintiff's security level at WDOC. Colorado law and CDOC policy call for and allow hearings any time inmates are accused of misconduct and/or being accused of being an "institutional security threat", or if being labeled as "an escape threat" and/or as having an "escape history" that impacts security and housing assignments.

Defendant Turner intentionally lied on the state forms when he made these assertions and intentionally incorrectly advised WDOC that Plaintiff was an escape threat, institutional security threat, and had labels that impacted classification, job and facility/housing assignments. Plaintiff was entitled to be heard and to challenge this incorrect information but was denied this opportunity to do so by defendants Williams, Trani, Olson, Dauffenbach and Turner.

Plaintiff also invokes the "willful and wanton" exceptions to state law as it applies to all defendants in this matter. Clearly Turner knew the information he was passing along would harm Plaintiff, and that it was not true, but Turner passed the incorrect information that he created, along to WDOC, in effort to cause harms to Plaintiff as far as his security level, housing and job assignments in WDOC.

(d)  The transfer papers generated by defendant Turner state that the reasons for the transfer were: "Offender Vreeland is claiming custody issues within Colorado Department of Corrections and refuses to be housed in general population. Vreeland was labeled a "snitch" while in the Douglas County Jail prior to coming to prison. This "snitch" jacket and the details of his crimes are causing Vreeland safety

issues in out prison system. The CDOC feels Vreeland would be safer in another state where his crimes are not known to the inmate population."

(i) This information is false, even still, due to the assertions made, Plaintiff did in fact have a right to a hearing prior to the transfer; (ii) knowing the reasons stated on the form, and the intentional lies told on the form to WDOC by Turner, designed to cause harm to Plaintiff, the form reveals retaliatory intent behind the transfer, reasons being, as the information provided was knowingly false and made up by Turner, and Defendants Williams, Trani, Olson, Dauffenbach and Jacobson all reviewed the forms prior to sending them to WDOC and prior to transfer, and all defendants knew the information was patently false and made up, the reasons for the transfer had nothing to do with Plaintiff's safety, the transfer was retaliation and represents "willful and wanton" conduct designed to cause mental, emotional, economical, social, legal, and physical harm to Plaintiff. This is a due process and retaliation claim under state and federal statute and constitutions invoking state law "willful and wanton" conduct exceptions to immunity under state law.

CLAIM SEVEN:

DISCRIMINATION AGAINST PLAINTIFF DUE TO PHYSICAL HANDICAP AND MEDICAL CONDITIONS WITH VIOLATION OF EQUAL TREATMENT UNDER THE LAW

Plaintiff arrived at CDOC's CSP on 4/13/2020. Before being sent there, CDOC actors, specifically defendant Dauffenbach, was aware that Plaintiff has A.D.A. lifting and other medical restrictions, and medical needs that required treatment. Defendant Lisac advised the Court in Vreeland v. Vigil, 18-CV-03165-PAB-SKC, ECF 102, that CDOC/CSP was aware of the medical issues, Plaintiff was receiving a lay-in from work and would not be required to work until the medical issues were resolved. Defendant Lisac asserted that Plaintiff would be given a job he could do once the medical issues were resolved.

Defendants Williams, Trani, Olson, Dauffenbach and Turner state in CDOC documents that they removed Plaintiff from CSP incentive unit due to Plaintiff's physical handicap and medical restrictions.

Prisoners with disabilities or handicaps are protected both by the Constitution and by federal statutes. The federal ADA, 42 U.S.C. § 12101 et seq, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, apply to prisoners.

Plaintiff currently has hearing, visual, mobility, and lifting-impairments and A.D.A. restrictions. CDOC was required under federal law to make accommodations available to Plaintiff for these impairments, but they did not.

Colorado statutes and CDOC policy require all CDOC facilities to accommodate inmates with disabilities or handicap, and require all CDOC facilities to provide A.D.A., handicap, disability job assignments to offenders. Each CDOC prison is supposed to have a specific amount of available A.D.A., handicap, disability inmate job assignments. Additionally, Colorado law, just as federal law, forbids retaliation against, and/or discrimination against, and/or denial of job and/or facility program and housing assignments based on A.D.A. handicap, or disability conditions and requirements.

Defendants Williams, Trani, Olson, Dauffenbach, Turner and Jacobson admit they have removed Plaintiff from the CDOC's CSP incentive unit due to disability. They specifically admit as follows: "... one of the purposes of the incentive worker pod is to fill job postings to provide essential services at Colorado State Penitentiary in areas such as food service, and laundry, for example. Mr. Vreeland's documented medical restrictions on heavy lifting prevented him from performing tasks associated with those jobs, so he is not a suitable candidate for permanent housing in the incentive unit worker pod at Colorado State Penitentiary."

Defendants claim Plaintiff was unable to perform job tasks at CSP, this,

however, was just another lie. Plaintiff has had all but his hearing disability since arrival to CDOC in 2008. The hearing damage and disability was caused at CTCF in 2015.

Since 2008 Plaintiff has been employed as unit clerk, laundry clerk, unit porter, janitor. Plaintiff lived in the BVCF incentive unit for years and presented an ability to run the entire BVCF Upper North Incentive Unit laundry as head laundry clerk from 2008 until 2013 when he was transferred. Plaintiff was then the head laundry clerk at FCF Unit-4 from 2013 until 2/2015. Plaintiff was then a unit porter/janitor at CTCF from 2/2015 until 6/2016. Plaintiff was then a unit laundry clerk/porter/janitor at AVCF from 6/2016 until 2/2020. At no time did Plaintiff's disability hinder his ability to be employed and/or to perform required tasks as Plaintiff was assigned job that he could do which were readily available and are required job assignments at all CDOC facilities, including, per CDOC policy, CSP incentive worker pod.

CDOC/CSP has laundry workers, janitors, and porters. Plaintiff requested he be assigned a job at any of these positions, he was told he would receive one after medical was complete but never did. Plaintiff offered to do the jobs he could while waiting for medical care, he was denied this as well.

In any event. Defendants claim they removed Plaintiff from CSP due to physical handicap and medical restrictions. This violated Plaintiff's rights under both state and federal law and constitutions to be free of discrimination and denied job opportunity and programs based on physical disability and handicap.

Further, CSP actually has an entire unit with unassigned inmates whom are there for safety and do not work, they are all in the incentive unit. As of May 20, 2021, that was unit D-4.

As Plaintiff was removed from CSP incentive due to disability, his rights were violated, and as CSP has an entire incentive pod unit with disabled inmates

that are there for safety and have no job at all, and as other disabled inmates with alleged safety issues are at CSP incentive pod and have jobs, Plaintiff was discriminated against due to being physically handicap and disabled, and he was denied equal treatment under the law where he was removed from CSP due to disability and handicap, and denied a job at CSP due to disability and handicap, but 28 other inmates are currently living at CSP incentive with both safety and disability handicap issues and they are allowed to remain without jobs, and some have been given jobs they can do, but Plaintiff was not.

Plaintiff was further subjected to violations of equal treatment under the law when these same defendants admit they removed Plaintiff from the CSP incentive unit as Plaintiff was required to be program compliant but was allegedly not program compliant as Plaintiff had allegedly not completed a sex offender treatment program, ("SOTMP").

(i) CDOC policy is that any inmate whom must complete SOTMP, the sex offender treatment program, is considered program compliant if he is on the waiting list for the program and has not refused to compete it; (ii) AVCF, CTCF, BVCF, SCF, LCF, FCF, CCF and all other CDOC prisons that have incentive units are full of inmates that have not yet completed SOTMP and whom are waiting; (iii) CDOC incentive units also have inmates living in them that are actively enrolled in SOTMP and are taking the class but have not completed it; (iv) Plaintiff was on the waiting list, he had never refused, and had actually sued CDOC asserting he was being denied access to the SOTMP program. In that case CDOC said Plaintiff was considered program compliant as he was on the list. In this instances the defendants now want to say that they are labeling Plaintiff as non-program compliant for failing to complete a program CDOC has steadfastly refused to allow Plaintiff to complete even after he sued to get into and complete.

(a) Removing Plaintiff from the CSP incentive unit for failing to complete a

program CDOC has not offered him and refuses to allow Plaintiff to complete violates due process and equal treatment of law as other inmates similarly situated to Plaintiff, i.e., with disability and alleged security issues, are at this very date living in incentive units across the state of Colorado and have not completed that program; (b) removing Plaintiff from CSP incentive for failing to complete a program not offered was discrimination against Plaintiff, violated due process and equal treatment of law. The CSP incentive unit clerk, whom had been the clerk for years, is a sex offender, is required to complete SOTMP, and has not yet done so, he is on a waiting list just like Plaintiff. 47 inmates in CSP incentive are sex offenders, waiting SOTMP and are allowed to be at CSP incentive until they get placement in an SOTMP class, 18 have disability. Additionally, inmates at CSP whom are sex offenders waiting SOTMP, once a spot is available for them at an SOTMP location, are sent to a SOTMP facility and placed in the incentive units at those facilities and complete the SOTMP class while living and working in the incentive units.

To label all CDOC inmates on the SOTMP waiting list as program compliant, and allowing all other CDOC inmates to live in incentive units; and to allow 47 similarly situated inmates to live at CSP incentive unit, but to then remove Plaintiff from the incentive unit and label him as non-program compliant, is discrimination and violates equal treatment of law, and represents further disparate treatment and retaliation in a "wilful and wanton" fashion designed to cause Plaintiff harm.

CLAIM EIGHT:

VIOLATION OF ACCESS TO COURT BY FRAUD LIES AND INTENTIONAL MISREPRESENTATION

After being subjected to a 72-day 7-different prison transfer and then landing at CSP, in the case Vreeland v. Vigil, 18-CV-03165-PAB-SKC, Plaintiff requested a mandatory injunction under Fed. R. Civ. P. Rule 65 ordering that CDOC.

was not to transfer Plaintiff out of state, and was to stop transferring Plaintiff all over the State of Colorado, and that Plaintiff was to remain at either CSP or CTCF until his medical care was complete or he was released.

Defendants Weiser, Woodward, and Lisac responded to the Court and stated, in effort to defeat that request and to prevent Plaintiff from successfully receiving an injunction he had a right to have entered, that Plaintiff would remain at CSP, would receive all medical care, and then would receive a job.

However, in June 2021 these same defendants responded to another Plaintiff motion seeking a hearing in regards to out of state transfer and seizure of legal files, and the defendants admit that they lied to the court in Vigil at ECF 102 when they asked the court to rule against Plaintiff and told the court that the CDOC's intent was to leave Plaintiff at CSP, provide the required medical care, and to then provide Plaintiff a job assignment.

The statement to the court at the time caused the court to rule against Plaintiff. As the statement was a known lie designed to prevent Plaintiff from success on the merits of his claim, the defendants violated Plaintiff's right to access the courts by lying to impede, frustrate and hinder the rightful outcome of that pleading and request for relief from a court of law.

Alternatively, when Defendants Polis, Weiser, Woodward, Allen, Williams, Trans, Olson, Dauffenbach, Turner, Jacobson and Rogers responded to Plaintiff recent motions in cases Vreeland v. Tiona; v. Huss; v. Vigil; v. Olson; and v. Polis, the defendants claim, in effort to defeat that motion, that the transfer of Plaintiff was put in place in March 2020, and asserted this claim in effort to defeat the requests hearing.

If the response in Vigil at ECF 102 was true, then all response were lies in regards to seeking a hearing regarding the transfer; if however the responses were true in regards to the transfer being scheduled in March of 2020, then the

responses in Vigil at ECF 102 were known lies.

Either way. It is a violation of access of court under the impede, frustrate or hinder aspects, for a party to knowingly lie to a court in response to a pleading in effort to defeat that opponent pleading and to prevent the opponent from success on a pleading when the opponent has a right to success on the pleading and the only response to defeat it is a know and intentional lie to the court.

As the Defendants named have intentionally lied to the court to defeat a request for relief from Plaintiff, defendants Polis, Weiser, Woodward, Allen, Williams, Trani, Olson, Dauffenbach, Jacobson and Rogers have, by the intentional lies, violated Plaintiff's rights to access the court and have engaged in abusive fraudulent civil process causing actual injury to Plaintiff.

CLAIM NINE:

VIOLATION OF DUE PROCESS AND STATE LAW PROPERTY CLAIM

On 5/20/2021 Defendants Little, Lisac, Brandt and Hunsaker seized all of Plaintiff's personal property located at CDOC/CSP UNIT D-1-12. Plaintiff's typewriter and TV were broken. Three fourths of Plaintiff's legal case files were seized and then later lost by CDOC agents.

To replace all lost property and all broken property it will cost Plaintiff in excess of $10,000.00. As all CDOC defendants caused the illegal retalitory transfer of Plaintiff, and as their agents either broke or lost the property at issue, the CDOC defendants must reimburse Plaintiff for all seized and not returned property and for all broken property.

CLAIM TEN:

HARASSMENT AND NEW THREATENED RETALIATION ASSOCIATED WITH THIS LAW SUIT AND ONE OTHER-

After filing the original hand written complaint in this matter on 6/18/2021,

Plaintiff filed a similar case in the U.S. District Court, Cheyenne, Wyoming, Vreeland v. Voigtsberger, et al., 21-CV-0150-NDF, asserting his relevant claims against the WDOC actors for violations of Plaintiff's rights.

As a result of the two cases Plaintiff has now been told, (i) he was moved to WDOC to put an end to all the litigation and complaints to the Colorado courts against Colorado state actors; and (ii) if Plaintiff persists in his continuing saga of complaints and law suits against Colorado and now WDOC agents, Plaintiff will be locked down in administrative segregation, his typewriter will be seized, and he will be move out of Wyoming and to a different state listed in the Interstate Corrections Compact.

Although threats of retaliation may not usually be grounds for claims in civil rights complaints, threats that are designed to place a person in fear of harm as retaliation for engaging in protected conduct, coupled with the fact that earlier threats were made and then acted out, that harassment then becomes grounds and a form of retaliation for engaging in protected conduct.

As Plaintiff has now been threatened with additional lockdown and transfer to some other unknown state, Plaintiff now lives in fear of harm as a result of his engaging in protected conduct, but Plaintiff will not stop pursuing his civil rights claims just because he has been subjected to retaliation and atypical significant hardships and threats, and loss of property and lockdowns.

WDOC actors have advised that Defendant Dauffenbach and Turner have relayed the message to WDOC's Voigtsberger, Turners counterpart in WDOC, to have Plaintiff advised, which he was on August 20, 2021, that if Plaintiff does not immediately stop his litigation he will be transferred again. This is a threat and harassment which is retaliation for engaging in protected conduct. The threats come directly from Defendant Dauffenbach and Turner.

F.   JURY DEMAND:

Plaintiff demands trial by jury.

G. RELIEF REQUESTED

Plaintiff demands the following relief;

1.   Actual, Punitive, Nominal and Compensatory damages in excess of five-million dollars from all State employed Defendants;

2.   Actual, Punitive, Nominal and Compensatory damages in excess of one-million dollars from Defendant Rogers;

3.   $10,000.00 in damages from CDOC defendants for loss of property and replacement of case files;

4.   Declaratory Judgment declaring the State of Colorado has forfeit jurisdiction over Plaintiff as far as criminal case 04CR706 conviction and sentence due to illegal transfer that did not comply with state statute and policy;

5.   Injunctive relief by way of order directing CDOC defendant to immediately return Plaintiff to the State of Colorado and to either CDOC's CSP, specifically to D-1-12 or to CTCF, and that Plaintiff is to remain at either of the two facilities until all medical conditions are provided the proper medical care they require and/or until Plaintiff is released.

6.   Punitive damages in excess of five million dollars for the delay in medical care the illegal transfer caused and for the pain and suffering Plaintiff has been subjected to.

Submitted this 23rd day of August, 2021.

Delmart E.J.M. Vreeland, II
Plaintiff, Pro Se

I swear under penalty of perjury the statement made herein by me are true and correct to the best of my knowledge, information and belief.

Delmart E.J.M. Vreeland, II
Plaintiff, Pro Se